Filed 9/30/22  P. v. Waller CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093431 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE018342) |
| v. | |
| ROY CHARLES WALLER, | |
| Defendant and Appellant. | |

Over a period of 15 years, defendant Roy Charles Waller broke into the homes of nine women, bound them, taped their eyes and mouths shut, demanded their money, and repeatedly sexually assaulted them. Years after he attacked his last two victims, defendant was identified through DNA evidence.  A jury found defendant guilty of all 46 counts charged against him, which included 21 counts of forcible rape, one count of attempted forcible rape, 10 counts of forcible sexual penetration, four counts of forcible oral copulation, one count of forcible sodomy, eight counts of aggravated kidnapping for extortion, and one count of aggravated kidnapping for rape.  It also found true numerous enhancements.  The trial court sentenced defendant to 897 years to life in prison.

1

On appeal, defendant argues there was insufficient evidence to support a guilty verdict on five counts of kidnapping for purposes of extortion and 11 kidnapping enhancements. He further challenges the imposition of various fines and fees. In a supplemental brief, defendant argues that he is entitled to resentencing under Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567). We reduce count five to felony false imprisonment and impose the lower term on that count. We further modify the judgment to impose section 290.3 penalty assessments and vacate defendant's main jail booking and main jail classification fees. We decline to remand for resentencing pursuant to Senate Bill 567, finding any error was harmless. In all other respects, the judgment is affirmed.

## FACTUAL HISTORY

### A.     *N. Doe, Rohnert Park, 1991*

In 1991, N. Doe posted an advertisement for a roommate in the local newspaper. Defendant called N. Doe in response and expressed interest in the home. N. Doe gave him the address. In the evening several days later, N. Doe fell asleep alone on her couch. She was awoken by defendant in a ski mask pointing a gun at her head. He crouched next to her with his arm around her back, told her to stay quiet, and said repeatedly, "I'm just here for your money, where's your money?" N. Doe thought to herself, "[H]e's just here to rob me, I'll just do exactly what he tells me to do and do it as quickly as possible and then get him out of here."

N. Doe told defendant that her money was in her purse. Defendant said, "Tell me where your purse is. If it's upstairs, . . . we're going to go upstairs." N. Doe said that her purse was upstairs, so he led her upstairs from behind with his gun pointed at her head. Defendant guided her towards the master bedroom with the gun, laid her facedown on the bed, bound her hands behind her back with a plastic cord, and bound her feet. He repeated that he was there to get money.

2

Defendant put a cloth in N. Doe's mouth, duct-taped her eyes and mouth shut, and put a pillowcase over her head. Defendant began to rummage around her house. He went downstairs, turned the TV up, and brought a boombox into the master bedroom, turned on music, and continued to ask where the money was located. After going downstairs again, he returned and demanded to know where her cash and ATM card were. N. Doe was terrified. She viewed defendant as forcing her to tell him where to find her purse and ATM card. Defendant took the pillowcase off N. Doe's head and tried to get her to motion where the purse with the money and ATM card was located. He repeatedly asked for her PIN. N. Doe did not know her PIN, but she was able to peek beneath the tape on her eyes and see the paper that had her PIN written on it. She could also see the gun next to her on the bed. She gestured towards the paper with her head and defendant, realizing she could still see, put the pillowcase over her head again.

Approximately an hour and a half after he arrived in N. Doe's house, defendant flipped N. Doe over and, as she was shaking and crying, he said, "Don't worry, this isn't going to be as bad as you think." Then he raped her. N. Doe was terrified for her life. Defendant apologized and told N. Doe he had been watching her for weeks. N. Doe begged him to leave, but he said he would leave when he was "done." At some point he said, "We're gonna be here all night, cause I know you're gonna be here by yourself tomorrow."

Defendant threatened to shoot N. Doe three or four times throughout the night. He said, "If you tell anyone, I'll shoot you, I'll come back and kill you." Defendant went downstairs again and rummaged through her things, which he had been doing throughout the course of the night and for "quite a bit of time." He returned to N. Doe's room and raped her two more times. Defendant then said that he had to go to the bank. He asked N. Doe where her bank was located, and she told him because he kept demanding it and because she hoped he would leave. Eventually, defendant retied her hands in front with duct tape, gave her a butter knife, and told her to wait three songs to give him time to go

3

to the bank before she cut herself free. He told her that if she called the police, he would know and would come back to kill her before they arrived. He left, and N. Doe waited three songs before unbinding herself and calling her mother, who called the police.

Defendant was in N. Doe's home for hours. When he left, he took two leather jackets, several pairs of black underwear, a 35mm camera, N. Doe's ATM card, the paper with her PIN, and cash from her purse. The police later determined that her ATM card was used after the attack.

B.    *T. Doe, Vallejo, 1992*

T. Doe, who lived alone, placed an advertisement in the newspaper to find a roommate. One morning, T. Doe awoke to her phone ringing and heard someone trying the doorknob on her bedroom door, which was locked. She walked down the hallway and found defendant hiding behind the bathroom door. He wore a black ski mask and gloves and held a rusty knife. T. Doe ran back into her bedroom and defendant jumped on top of her. She screamed, struggled, and grabbed the knife, cutting her hand.

T. Doe broke free and ran towards the window to jump. However, she tripped, and defendant jumped on top of her. Defendant put his hand over her mouth for so long that she could not breathe. At some point T. Doe struck him with a lamp and pushed the broken blade from the knife into his face, cutting him above his right eyebrow.

Defendant repeatedly told T. Doe that he was there to rob her. He said, "I don't want to hurt you, I just want your money." Defendant duct-taped T. Doe's eyes and mouth shut. He bound her hands and feet as she lay face down on the floor, picked her up, and put her on the bed. He tied her hands and ankles "spread-eagle" to the bedposts. Defendant cut off T. Doe's pajamas, fondled her, and raped her.

T. Doe asked him why he picked her, and defendant stated two or three times that he just came to get money. He went through T. Doe's purse, where her ATM card was located. Defendant got on top of T. Doe a second time. He commented on the heart

pendant that she wore around her neck, removed the necklace, and raped her again. Thereafter, he walked around the house again, returned, and raped her a third time.

Defendant was in T. Doe's home from approximately 8:00 a.m. to 2:00 p.m. T. Doe struggled to loosen the ropes and escape every time he left the room but was unable to do so. When she could no longer hear defendant, she pulled hard on the ropes, freed herself, and called the police. After defendant left, T. Doe's heart pendant and a jug of coins were gone.

C. *R. Doe, Chico, 1997*

One evening, 21-year-old R. Doe returned home to her apartment after a night out with her sister. At 4:20 a.m., she awoke to defendant in a ski mask covering her mouth with his gloved hand, and holding a gun to her head. He said, "Shut the fuck up, I have a gun, I'll kill you." He said the gun was not fake.

Defendant told her he just wanted some "quick cash and then he would leave." He forced R. Doe onto her stomach and zip-tied her arms behind her back. He tied her legs spread-eagle to the bedposts. He put duct tape over her mouth and eyes. Defendant later removed the zip ties, turned her over, spread her arms and legs in an "X" shape, and tied her ankles and wrists to the bedposts with rope.

Defendant repeatedly left the room to rummage through her things. R. Doe tried, unsuccessfully, to free herself. Approximately 30 minutes to an hour after arriving, while R. Doe was still bound to the bed, defendant told R. Doe he wanted her ATM card and asked for its location. She said it was in her car, so he took her keys and went to the car. When he returned, he asked for her PIN, which R. Doe felt "force[d]" to disclose. She gave him her PIN because she was afraid of him, as he had a gun and said he would kill her. However, the bank account connected to her ATM card and the PIN had been closed.

R. Doe got one arm free, and when defendant saw, he became angry and said, "I'm gonna have to tie you up tighter now, because you're trying to get free."

5

Eventually, R. Doe got both arms free, removed the duct tape on her face, and grabbed a pair of scissors, demanding that defendant leave. Defendant charged at her and she stabbed defendant's arm with the scissors. Angry, defendant said, "You've really done it now, you're gonna get it." He tied her up again in the spread-eagle position and placed duct tape back on her face. When she held her knees together, he pinched her nose closed, saying he would let her breathe if she spread her legs. Defendant kneeled next to the bed and fondled R. Doe. He then got on top of R. Doe and rubbed his penis against her labia for 15 to 20 minutes multiple times. Defendant said he would stay all day. R. Doe was terrified.

Defendant left around 7:00 a.m. R. Doe freed herself and ran to her property manager's apartment, who called the police.

D.      *K. Doe and Y. Doe, Sacramento, 2006*

A woman posted ads on Craigslist and social media in May 2006 seeking a "20-something year[] old" Asian female to rent a room in her Sacramento home. K. Doe was already renting one of the bedrooms. Y. Doe rented another room in the home beginning in approximately August 2006. One evening in October 2006, K. Doe was home alone. At approximately 12:30 a.m., she called Y. Doe to check on her, who said she was out at a restaurant. K. Doe hung up and showered. When she emerged from the bathroom, she saw defendant standing in front of her. K. Doe screamed, and defendant grabbed her, covered her mouth, and pointed a gun to her temple. He told her to be quiet, that he just wanted money, and that it would be over soon.

Defendant told her to get down on the floor, which she did because she was scared and wanted him to take the money and leave as soon as possible. As K. Doe lay on her stomach, defendant put tape over her eyes and mouth. He put her hands behind her back and wrapped tape around her hands and wrists. Defendant repeatedly asked her where her money was located. Because her mouth was taped shut, he asked her "yes" and "no" questions about the whereabouts of her money. K. Doe shook her head "no" until he

6

stated her wallet's correct location—the dresser—and nodded "yes." She disclosed where her money was located because she was afraid, defendant had a gun that he had pointed at her head, and told her he wanted money. At one point, while K. Doe was bound, facedown in the hallway, defendant asked for the PIN to her ATM card. Although defendant kept asking for the number, K. Doe could not communicate it because her mouth was taped shut. So, defendant recited numbers aloud while K. Doe nodded when each number was correct. However, K. Doe gave him the wrong PIN.

After about 30 minutes, defendant picked K. Doe up and moved her to the master bedroom. He placed her facedown on the floor of the bedroom for another 20 to 30 minutes, asking where her money could be found. When he saw she only had $50 in her wallet, he asked, "Where's the rest of the money?" She shook her head to communicate that there was no more money left. He continued to rummage around the house. Defendant also asked when her roommate would return, apparently aware that K. Doe had a roommate. He eventually moved K. Doe to the bed and duct-taped her ankles together.

At approximately 1:30 a.m., Y. Doe entered the house through the garage. Defendant jumped in front of her, covered her mouth with his hand, and pointed a gun at her temple. He told K. Doe not to "do anything stupid," that he just "want[ed] some money." Keeping his hand over her mouth, defendant pushed Y. Doe towards the master bedroom. As they walked, he told Y. Doe to drop her purse, which she did because she did not want to make him angry and hoped he would take the money and go. In the master bedroom, Y. Doe saw K. Doe facedown and bound on the bed. Defendant told Y. Doe to get on the floor, where he duct-taped her mouth and eyes shut and taped her wrists together behind her back.

Defendant looked through Y. Doe's purse for her wallet. He pulled out a card and asked if it was her ATM card. Y. Doe shook her head "no." Then he took out another card and asked if it was her ATM card. She nodded "yes." He asked for her PIN.

7

Defendant went number by number as Y. Doe, feeling very afraid, nodded in response to certain numbers. However, Y. Doe purposely did not give him the correct PIN because she did not want to give him her money, even though she felt she had to give him the numbers. Defendant also asked for the location of her money in the house. Y. Doe indicated towards the desk with her head. She felt she had to tell defendant because she was scared for her life and did not want to anger him. The money was gone from the desk after defendant left.

Defendant picked up Y. Doe, carried her to the closet, and sat her on a stool inside the closet. He repeatedly asked, "Where is the stash of money?" She shook her head "no" because she had no more money. He told her that he had a gun, the car he was driving was stolen, and he had nothing to lose. Defendant picked her up and moved her to the bed, placing her on her back next to K. Doe. Holding a gun to K. Doe's head, defendant orally copulated K. Doe's vagina and anus. He penetrated her vagina with his finger approximately 30 times, as he continued to ask where he could find her money. At times he would go rummage around the house, and return to penetrate K. Doe with his finger again.

Defendant turned to Y. Doe and raped her. He then went to other rooms in the house, opening drawers. Defendant returned and orally copulated Y. Doe, repeatedly putting his fingers in her vagina. He left again to rummage through drawers. He returned and raped Y. Doe a second time. He went back and forth between the two roommates, raping them a total of four times each.

After cutting off their clothes, defendant washed K. Doe and Y. Doe in separate bathtubs while putting his fingers in their vaginas. He carried each of them back to the bed and told them not to call the police. After he left, K. Doe and Y. Doe freed themselves.

Defendant took K. Doe's ATM card, credit card, business cards, a spare key, student ID, garage door opener, digital camera, and a pair of underwear. He took

8

Y. Doe's driver's license, ATM card, $200 in cash, a photo of her, her clothing, a towel, and the bedsheet from her bed.

E.   *Additional victims*

Defendant assaulted four additional victims. We summarize these crimes briefly, as the details are not necessary to resolve this appeal.

In 1996, defendant entered S. Doe's home in Martinez, bound her, raped her four times, and penetrated her with a tool attached to a vacuum. Defendant stole pieces of S. Doe's undergarments that he cut off her, her ATM card, and cash. He used the PIN that S. Doe gave him to withdraw $300 from her bank account.

In 1997, defendant broke into T.H. Doe and K.H. Doe's Davis apartment through a window. He bound them, placed tape over their eyes and mouth, raped T.H. Doe twice, and penetrated her with a plastic object. He kissed K.H. Doe's body and rubbed his penis on her thigh. Defendant took K.H. Doe's ATM card, credit cards, keys, and checkbook. T.H. Doe's ATM card and her diamond ring were missing after defendant left. Using the PIN's he obtained during the assault, he withdrew $300 from K.H. Doe's bank account and $300 from T.H's Doe's bank account.

In 2000, defendant entered C. Doe's Davis home while she was home alone. He bound her and carried her to her car, where he raped and sodomized her in the backseat. C. Doe's wallet was missing after defendant left.

F.   *DNA identification and additional evidence*

In 2018, law enforcement received information regarding defendant as a possible suspect. They obtained defendant's DNA and an analyst found that it was consistent with the DNA profile from the vaginal swabs taken in the Sacramento case. Police arrested defendant and their searches revealed numerous items that were consistent with his crimes. Defendant had a backpack containing a "tactical pen" with a "window punch," used for breaking windows, zip ties, packing tape, a flashlight, condoms, and a vehicle tracking device. He had two storage units, where police found five black zippered bags

9

containing, among other things, ski masks, ropes, zip ties, baby oil, condoms, a pry bar, duct tape, a flashlight, a stun gun, handcuffs, razors, black gloves, women's underwear, and scissors. The storage units also contained locksmith equipment and instructions, printed advertisements for rooms for rent, maps, and e-mails from a single e-mail account purporting to be various women inquiring about rentals, along with maps and floorplans. A search of defendant's home revealed approximately 10 guns and a computer, which contained several photographs of naked women bound to beds.

The police obtained a buccal swab from defendant. His DNA profile matched DNA taken from all of the crime scenes described above except the 1997 Davis crime scene pertaining to T.H. Doe and K.H. Doe.

## PROCEDURAL HISTORY

Following trial, the jury found defendant guilty of the following crimes against his nine victims: (1) three counts of rape (Pen. Code, § 261, subd. (a)(2))[1] and one count of aggravated kidnapping for extortion (§ 209, subd. (a)) as to N. Doe; (2) three counts of rape, one count of aggravated kidnapping for extortion, and two counts of digital penetration (§ 289, subd. (a)) as to T. Doe; (3) four counts of rape, three counts of digital penetration, one count of aggravated kidnapping for extortion, and one count of oral copulation (former § 288a, subd. (c)) as to S. Doe; (4) two counts of rape, one count of digital penetration, and one count of aggravated kidnapping for extortion as to T.H. Doe; (5) one count of aggravated kidnapping for extortion as to K.H. Doe; (6) one count of kidnapping for extortion and one count of rape as to R. Doe; (7) one count of aggravated kidnapping to commit rape (§ 209, subd. (b)(1)), two counts of digital penetration, one count of rape, one count of sodomy (§ 286, subd. (c)(2)), and one count of oral copulation as to C. Doe; (8) three counts of rape, one count of attempted rape (§§ 664, 261, subd. (a)(2)), one count of oral copulation, one count of digital penetration, and one count of

---

[1] Undesignated statutory references are to the Penal Code.

10

aggravated kidnapping for extortion as to K. Doe; and (9) four counts of rape, one count of oral copulation, one count of digital penetration, and one count of aggravated kidnapping for extortion as to Y. Doe. The jury further found true all special allegations, which included various enhancements for personal use of a firearm, use of a deadly and dangerous weapon (knife), committing crimes during a burglary, kidnapping victims, kidnapping victims to substantially increase the risk of harm, multiple victims, and tying or binding victims. The trial judge deemed count thirty-six, attempted rape, with a personal use of a firearm enhancement as to K. Doe, the principal term, and sentenced defendant to an indeterminate term of 438 to life in prison plus a consecutive, determinate term of 459 years, for a total sentence of 897 years to life in prison. It also imposed various fines, fees, and victim restitution.

DISCUSSION

I

*Kidnapping for Purposes of Extortion and Kidnapping Enhancements*

Defendant argues there was insufficient evidence to convict him of kidnapping for purposes of extortion as to victims N. Doe (count four); T. Doe (count five); R. Doe (count twenty-five), K. Doe (count thirty-nine); and Y. Doe (count forty-six). He further contends that the same evidentiary deficiencies apply to the section 667.61, subdivision (e)(1) kidnapping enhancements, which correspond to K. Doe and Y. Doe.[2] The People concede that there is insufficient evidence to support defendant's conviction on count five against T. Doe, and the parties agree we may reduce count five to felony false

---

[2]     The aggravated kidnapping enhancements at issue apply to counts thirty-three through thirty-five, thirty-seven, and thirty-eight (K. Doe) and forty through forty-five (Y. Doe). The jury relied on the same jury instruction, CALCRIM No. 1202, to determine whether defendant was guilty of kidnapping K. Doe and Y. Doe for extortion (counts thirty-nine and forty-six, respectively) and to assess the kidnapping enhancements.

11

imprisonment. The People otherwise aver that substantial evidence supports the jury's verdict on the other counts. We consider defendant's arguments as to each victim in turn.

A. *Applicable legal principles*

Section 209, subdivision (a) defines aggravated kidnapping as holding or detaining, or intending to hold and detain, a person (1) for ransom; (2) for reward; (3) to commit extortion; or (4) to exact from another person any money or valuable thing. Under the statute, the kidnapping victim may be the same person as the person who is being extorted. (*People v. Stringer* (2019) 41 Cal.App.5th 974, 981-982.)

"[T]he crime of extortion is related to the offense of robbery; indeed, courts have sometimes found it difficult to distinguish these two offenses. [Citations.] The statutory definitions of robbery and extortion are structurally similar. [Citation.] Both offenses have their roots in common law larceny and both share a common element—acquisition by means of force or fear." (*People v. Kozlowski* (2002) 96 Cal.App.4th 853, 866 (*Kozlowski*).) However, the two crimes differ in several ways. In an extortion, the property is taken with the victim's consent, while in a robbery, the property is taken against the victim's will. (*Ibid.*) Further, robbery requires "a specific intent to permanently deprive the victim of the property" and "requires the property be taken from the victim's 'person or immediate presence.' (§ 211.)" (*People v. Torres* (1995) 33 Cal.App.4th 37, 50.) Extortion, on the other hand, requires only "the specific intent of inducing the victim to consent to part with his or her property." (*Ibid.*)

Per section 518, extortion is accomplished by obtaining the "property or other consideration from another." (§ 518, subd. (a).) Under this chapter, " 'consideration' " means "anything of value." (§ 518, subd. (b).) Further, courts have construed "property" broadly within the extortion context, finding that intangibles such as a PIN to access a bank account constitutes "property" within the meaning of the extortion statute. (*Kozlowski, supra*, 96 Cal.App.4th at pp. 867-868; see also *People v. Fisher* (2013) 216 Cal.App.4th 212, 217-218 [the right for an employer to choose an employee can be

extorted property]; *People v. Baker* (1978) 88 Cal.App.3d 115, 119 [right to file an administrative complaint is property for purposes of extortion].)

In reviewing a defendant's challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence. Substantial evidence is evidence that is credible, reasonable, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

We do not reassess the credibility of witnesses, and we draw all inferences from the evidence that supports the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.) If substantial evidence supports the verdict, we defer to the trier of fact and do not substitute our evaluation of witness credibility for that of the jury. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) If the record supports the jury's findings, our belief that the circumstances might also reasonably support a contrary finding does not warrant a reversal of judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

B.      *N. Doe (count four)*

Defendant contends insufficient evidence supports the jury's finding that defendant kidnapped N. Doe for purposes of extortion, because the evidence shows that defendant took N. Doe's ATM card and PIN *without* her consent, negating an essential element of extortion. In making this argument, defendant attempts to draw a distinction between consenting to give property to a perpetrator versus telling a perpetrator where property is located, insisting that the latter is not "consent." Defendant argues that upholding defendant's conviction as extortion would impermissibly blur the line between robbery and extortion, permitting the prosecution to obtain a conviction for aggravated kidnapping in every case where the victim is detained and the robber asks, "Where is your money?" We are not persuaded.

At the outset, we recognize that the line between robbery and extortion is not always well defined. The two crimes can be difficult to distinguish from each other, in

13

part because there is a legal paradox inherent in the definition of extortion that provides for a taking that is simultaneously consensual *and* the result of force or fear. (*People v. Torres, supra*, 33 Cal.App.4th at p. 50, fn. 6; *People v. Peck* (1919) 43 Cal.App. 638, 643 (*Peck*).) Consequently, there is sometimes a subtle distinction between taking property by force or fear consensually (extortion) versus taking property by force or fear against the victim's will (robbery). While we acknowledge the distinction can be murky in certain cases, we conclude that in this case, a reasonable jury could find that N. Doe consented to give defendant her property when she disclosed to defendant its location.

The law of extortion generally treats the victim's compliance as consent. Property is extorted when the victim consents to "surrender" his or her property under duress. (*People v. Goodman* (1958) 159 Cal.App.2d 54, 61.) A victim's consent may be coerced where the victim gives the perpetrator money but "protest[s] in his own heart against his money being taken for that purpose." (*People v. Peck, supra*, 43 Cal.App. at p. 645.) Thus, a victim of extortion may "consensually" give money (or other property) to the extorter, but not with the "free consent or willingness that he would pay out money to satisfy an obligation or to subserve some charitable or useful public purpose." (*Ibid*.)

Here, defendant broke into N. Doe's home, held a gun to her head, and asked where her money was located. N. Doe decided to do exactly as defendant demanded, as quickly as possible, in the hopes that he would take her money and leave. She told defendant the money was in her purse, and that her purse was upstairs. He guided her upstairs with his gun, covered her eyes and mouth with tape and her head with a pillowcase, bound her hands and feet, and demanded to know where her ATM card was located. He took the pillowcase off her head so she could motion to him the location, which she did. Defendant then demanded her PIN, and N. Doe, still bound, used her head to gesture towards the paper with the PIN on it. After raping the still bound N. Doe three times, defendant asked where her bank was located, and she told him. Defendant left N. Doe's home, and her ATM card was used thereafter.

14

This evidence is sufficient to show that N. Doe consented, through force or fear, to give defendant her ATM card and PIN. In response to defendant's demand for her purse, N. Doe told defendant where her purse was located while defendant held her at gunpoint. When defendant was still unable to find N. Doe's ATM card in her purse, N. Doe—hands and feet tied, blinded, and vulnerable—indicated to defendant its precise location. She similarly gestured towards a paper on which her PIN was written, thereby surrendering both her ATM and PIN to defendant while under duress. As a result of N. Doe's consent, defendant obtained the ATM card and PIN and accessed N. Doe's bank account. Thus, substantial evidence supports the jury's finding that she was coerced by force or fear into surrendering her property. (See, e.g., *Peck, supra*, 43 Cal.App. at pp. 643-644 [extortion conviction upheld when the victim told the defendant where the victim's money was located out of fear the defendant would harm him].)

Defendant next argues that the verdict is unsupported because N. Doe did not give defendant her PIN and, in any event, her PIN lacked value because he did not take any money from her bank account. As an initial matter, defendant misrepresents the record. N. Doe testified that she gestured to the location of her ATM card and the paper with her PIN on it. Defendant took both, and her bank account was accessed after defendant fled.

Further, it is the access to N. Doe's bank account that the PIN provides, and not the amount of money taken, that leads us to categorize a PIN as property that may be extorted. "[T]he means to bank account access is an intangible benefit susceptible of possession. [Citation.] Thus, it may reasonably be said that a PIN code is property because it implies the right to use that access code—and to access the funds in the related bank account by means of that code." (*Kozlowski, supra*, 96 Cal.App.4th at p. 867.) As explained in *Kozlowski*, by extorting a PIN, the extorter deprives the victim of his or her exclusive right to access the bank account. (See *id*. at p. 869.) And here, defendant did not solely extort the PIN, but the ATM card as well, allowing defendant to get into N. Doe's bank account. Thus, both the ATM card and the PIN constitute property that

15

defendant extorted. (*Ibid.*) As substantial evidence shows that defendant coerced N. Doe's ATM and PIN from N. Doe, substantial evidence supports the jury's finding that he intended to extort property from N. Doe. (See *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1248-1252 [taking lock to make an unauthorized copy of a key was theft because it impaired the victim's right of exclusive possession and use of her home].)

C. *R. Doe (count twenty-five)*

Defendant next contends that insufficient evidence supports the jury's finding that R. Doe consented to give defendant her ATM card and PIN. Again, we disagree.

The evidence of R. Doe's consent obtained through force or fear is similar to that of N. Doe's consent, and the jury's findings are supported for the same reasons. Defendant broke into R. Doe's house, held her at gunpoint, and threatened to kill her. He told her he would leave if she gave him some "quick cash." Defendant tied her spread-eagle to the bed, and duct-taped her eyes and mouth closed. After leaving her bound for approximately 30 minutes to an hour, defendant asked R. Doe, still tied up, where her ATM card was located. R. Doe told defendant it was in her car. Defendant obtained the card and asked for her PIN. R. Doe told defendant her PIN because she was afraid, as he had a gun and threatened to kill her. This is sufficient evidence for a rational jury to conclude that defendant took her ATM and PIN, with her consent, through force or fear. Indeed, evidence of R. Doe's consent is particularly strong here, where her PIN was not a tangible object that defendant could forcibly take from her, as in a robbery, but rather something intangible that defendant could only extract from a consenting victim. (E.g., *People v. Fisher, supra*, 216 Cal.App.4th at pp. 216-219; *Kozlowski, supra*, 96 Cal.App.4th at pp. 865-869; *People v. Baker, supra*, 88 Cal.App.3d at p. 119.)

Nonetheless, defendant notes that R. Doe's bank account had been closed, and thus he would have been unable to use the ATM card and PIN to access her account. He therefore insists that both the ATM card and PIN lack value and cannot constitute extorted property. However, defendant's argument fails to appreciate the language of

16

section 209, which makes clear that it is only defendant's *intent* to extort property, and not his ultimate success, that is required under the statute.

Defendant was not convicted of extortion under section 518, which is defined as "the obtaining of property from another, with his or her consent, . . . induced by a wrongful use of force or fear . . . ." (§ 518, subd. (a).) Rather, defendant was convicted of kidnapping for extortion under section 209, subdivision (a). In relevant part, a person is guilty under the statute if he or she seizes, confines, or kidnaps a victim "*with intent* to hold or detain . . . that person . . . to commit extortion . . . ." (§ 209, subd. (a), italics added.) Thus, to be found guilty of aggravated kidnapping, a defendant need only have the *intent* to hold the victim to obtain the person's property through coerced consent. A defendant need not actually accomplish his or her purpose by ultimately obtaining property. (See also CALCRIM No. 1202 (§ 209, subd. (a)) ["Someone intends to commit extortion if he intends to: (1) obtain a person's property with the person's consent and (2) obtains the person's consent through the use of force or fear"], italics omitted.)

In this sense, kidnapping for purposes of extortion is comparable to an attempt to commit a crime. Like an attempted crime, "[t]he crime of kidnaping for [extortion] is complete when the kidnaping is done for the specific purpose of obtaining [property or consideration] even though the purpose is not accomplished. To define kidnaping for [extortion] otherwise would overlook the underlying gravity of the offense with an unwarranted emphasis on the success of the criminal activity." (*People v. Anderson* (1979) 97 Cal.App.3d 419, 425 [discussing section 209, subdivision (a) in the related context of kidnapping for ransom].) Indeed, as our Supreme Court has explained, " '[i]t is the means employed [to obtain the property of another] which the [extortion] law denounces.' " (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 326-327.) Thus, even if we were to conclude that R. Doe's ATM card and PIN did not constitute "property" for purposes of extortion because they do not connect to an open account, a reasonable jury could still find that, by obtaining R. Doe's ATM card and PIN and repeatedly demanding money,

defendant kidnapped R. Doe for the *purpose* of obtaining property: a functioning ATM card and PIN that provided access to an open account.

Further, we are not persuaded that an ATM card and PIN cannot be extorted simply because they are linked to a closed account. When considering the value of an ATM card and PIN connected to a closed account, we may look to robbery and larceny offenses for guidance, "because the crime of extortion is related to the offense of robbery." (*Kozlowski, supra*, 96 Cal.App.4th at p. 866.) In the context of robbery, "the lack of value of the asported matter cannot efface the crime." (*People v. Graham* (1969) 71 Cal.2d 303, 326-327 [sufficient evidence of robbery where the perpetrator ripped off the victim's empty pants pocket].) As our Supreme Court has explained, a defendant who takes a wallet through force or fear is guilty of robbery even if the defendant, "after finding [the wallet] to be empty, casts it aside." (*Id*. at p. 327.) And, the definition of "property" is defined more narrowly in the context of robbery than the extortion context. (*Kozlowski*, at p. 866.) Thus, we can reasonably conclude that even if the ATM card and PIN were worthless beyond the value of the card's plastic, they still constitute property, like the empty wallet, which may be extorted. This is supported by the rationale in *Kozlowski*, which did not rely on the amount of money in the bank account to conclude that a PIN constitutes property under section 209, subdivision (a). Indeed, *Kozlowski* held that a PIN is property for purposes of extortion, despite the fact that there was no money in the account linked to one of the victim's ATM cards. (*Kozlowski*, at p. 858.)

Thus, as the ATM card and PIN constitute property, and because there is evidence in the record that defendant obtained the ATM card and PIN through coerced consent, substantial evidence supports the finding that defendant intended to extort property from R. Doe.

18

D.    *K. Doe (count thirty-nine) and corresponding penalty provisions (counts thirty-three through thirty-five, thirty-seven, and thirty-eight)*

With respect to K. Doe, defendant again argues that there is insufficient evidence to show she consented to give her property to defendant, and that defendant extorted nothing of value, because there is no evidence defendant used the ATM card and PIN to extract money from her account. Defendant further argues, for the first time on reply, that the PIN provided by K. Doe was not an item of value because it was an incorrect number that did not provide access to her bank account.[3] We conclude substantial evidence supports the verdict.

First, substantial evidence supports the jury's finding that K. Doe consented to give defendant her ATM card out of force or fear. As with defendant's other victims, he broke into K. Doe's house and held her at gunpoint. Defendant duct-taped her eyes, mouth, and wrists, and repeatedly asked for her money, telling her he just wanted her money, and it would be over soon. Defendant asked where her money was located and, because she was bound and her mouth was taped shut, K. Doe shook her head "no" until he stated her wallet's location—the dresser—and then nodded "yes." She told him where her wallet was because she was afraid and defendant had pointed a gun at her head, demanding money. Defendant removed her ATM card and asked for her PIN. K. Doe nodded along to the numbers he recited to give him a PIN, but she purposely gave him the incorrect number. Thus, there was sufficient evidence for a rational jury to conclude that K. Doe, fearful for her life, consented to give defendant her ATM card.

---

**3**      While we typically decline to address arguments made for the first time on reply to prevent unfairness to the other party (*People v. Tully* (2012) 54 Cal.4th 952, 1075), it is the People who first raise this issue and address it in their responsive brief. Thus, we will consider the merits of defendant's argument, as the People are not prejudiced by us doing so.

And as discussed *ante*, it is irrelevant that defendant was unable to use the ATM card to access K. Doe's account. The ATM card, by itself, constitutes tangible property. Moreover, defendant consistently insisted he was only in K. Doe's home for money. He demanded both K. Doe's ATM card and PIN, and he obtained her ATM card and extracted a false PIN through consent induced by force or fear. Based on this evidence, a reasonable jury could also conclude that defendant detained her with the *intent* to extort her PIN, which is all that section 209 requires.

E.      *Y. Doe (count forty-six) and corresponding penalty provisions (counts forty through forty-five)*

Again, defendant challenges whether there was sufficient evidence that Y. Doe consented to give defendant property. And again, we conclude that substantial evidence supports the jury's verdict that defendant kidnapped Y. Doe for purposes of extortion. As Y. Doe came home, defendant jumped in front of her, held a gun to her head, and said, "Don't do anything stupid, I just want some money." While he pushed her towards the bedroom, he demanded she drop her purse, which she did because she did not want to make him angry. Defendant bound Y. Doe in the same manner as K. Doe and found a bank card in her purse. He asked Y. Doe if it was her ATM card, and she shook her head "no" until defendant pulled out her ATM card, at which time she nodded "yes." As he did with K. Doe, defendant asked Y. Doe for her PIN and, because she had tape over her mouth, she nodded when defendant stated the correct number. However, Y. Doe also purposely gave him the wrong PIN. Defendant asked where her money was located, and Y. Doe, hands bound behind her back, gestured towards the desk with her head. After he left, $200 was gone from her desk.

This evidence is sufficient for a rational jury to find that Y. Doe consented to give defendant her money and ATM card under duress. It is also sufficient for a rational jury to find that defendant intended to extort Y. Doe's PIN.

20

F.      *T. Doe (count five)*

Defendant argues, and the People concede, that there is insufficient evidence to support the jury's finding that he took any of T. Doe's property without her consent. We agree with the parties, as the evidence shows only that defendant took T. Doe's heart pendant and a jar of coins, but there is no evidence that he did so with T. Doe's consent. Thus, the jury's finding that defendant kidnapped T. Doe for extortion is not supported by substantial evidence.

In view of this, the People argue that we should reduce count five to the lesser included offense of felony false imprisonment. Defendant agrees that we have the authority to do so, but contends that if we do reduce his conviction, we should remand for resentencing. The People argue that because defendant was sentenced to multiple indeterminate terms on other counts, resentencing is not required.

When a verdict or finding is contrary to law or evidence, but the evidence shows the defendant to be guilty of a lesser included offense of the crime charged, we may modify the judgment to reduce the verdict to the lesser offense where the prosecution prefers this approach, rather than retrying the greater offense. (§ 1260; *People v. Kelly* (1992) 1 Cal.4th 495, 528.) Felony false imprisonment is a lesser included offense of kidnapping for extortion. (*People v. Eid* (2014) 59 Cal.4th 650, 657.)

Here, consistent with the parties' concessions, we find it appropriate to reduce defendant's kidnapping for extortion conviction on count five to felony false imprisonment. "[T]he essential element of false imprisonment is restraint of the person. Any exercise of express or implied force which compels another person to remain where he does not wish to remain, or to go where he does not wish to go, is false imprisonment. [Citation.] False imprisonment is a felony if it is effected by violence or menace. (§ 237.)" (*People v. Bamba* (1997) 58 Cal.App.4th 1113, 1123.) In accordance with these principles, to find a defendant guilty of felony false imprisonment, a jury must find that "the defendant intentionally restrained, or confined, or detained someone by violence

21

or menace," and the "defendant made the other person stay or go somewhere against that person's will." (CALCRIM No. 1240.) In this context, "menace" "means a verbal or physical threat of harm, including the use of a deadly weapon." (*Ibid*.) "The threat of harm may be express or implied." (*Ibid*.)

By finding defendant guilty of kidnapping T. Doe for purposes of extortion, the jury necessarily found that defendant "kidnapped, abducted, seized, confined, or carried away" T. Doe with the intent to "hold or detain" her. (CALCRIM No. 1202.) This finding is supported by substantial evidence, as defendant jumped on top of T. Doe with a knife, placing his hand over her face until she could not breathe. He then tied T. Doe to the bed for six hours and raped her repeatedly. Although she frequently struggled to loosen the ropes and escape, she was tightly bound and could not break free until defendant left. Further, defendant's use of a knife, physical attack, smothering T. Doe until she was unable to breathe, and repeated sexual assaults, constitute substantial evidence that defendant restrained T. Doe through violence or menace. We accordingly modify the judgment to reduce count five to felony false imprisonment.

With respect to sentencing, the trial court sentenced defendant to seven years to life for kidnapping for extortion, plus one year for the deadly weapon enhancement, for a total of eight years to life on count five. However, the sentencing triad for felony false imprisonment is a determinate term of 16 months, two years, or three years. (§§ 237, 1170, subd. (h).) While recognizing that false imprisonment carries a lower sentence than aggravated kidnapping, the People still urge us to deny defendant resentencing on count five because count five was a subordinate term, and the trial court sentenced defendant to an indeterminate term of confinement on multiple other counts. In effect, the People appear to argue that a reduced sentence on count five will be of no practical consequence given defendant's lengthy and partially indeterminate sentence. While there may be some truth to this argument, defendant is nonetheless entitled to a sentence that reflects his reduced conviction. (E.g., *People v. Burbine* (2003) 106 Cal.App.4th 1250,

1258.)  In the interest of judicial economy, we exercise our authority to modify the judgment (§ 1260) rather than remanding for resentencing.  (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1473.)  We accordingly impose the lower term sentence of 16 months on count five (§§ 237, 1170, subd. (h)) to run concurrent to defendant's sentence.

II

*Assembly Bill No. 1869 (2019-2020 Reg. Sess.)*

Defendant next argues that the $544.27 fee imposed on him under Government Code former section 29550.2 is properly stricken given the passage of Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Assembly Bill 1869), which went into effect July 1, 2021. (Stats. 2020, ch. 92, § 11.)  The People concede the issue and we agree with the parties.

Assembly Bill 1869 was enacted to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and . . . all outstanding debt incurred as a result of the imposition of administrative fees."  (Stats. 2020, ch. 92, § 2.)  Among other things, Assembly Bill 1869 repealed Government Code section 29550.2, which previously authorized the $453.62 main jail booking fee and $90.65 main jail classification fee imposed on defendant at sentencing.  (See Gov. Code, former § 29550.2.)  It also enacted Government Code section 6111, which provides:  "On or after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."  (Gov. Code, § 6111, subd. (a).)

Because Assembly Bill 1869 makes the unpaid balance of any main jail booking fee unenforceable and uncollectible, and it requires that any portion of a judgment

23

imposing such a fee be vacated, we shall modify the judgment to vacate defendant's $453.62 main jail booking fee and $90.65 main jail classification fee.[4]

III

*Defendant's Ability to Pay*

Defendant further argues that the trial court violated his right to due process, equal protection, and the federal and state constitutional prohibitions against excessive fines by imposing fines, fees, and assessments without holding a hearing to determine his ability to pay.[5] These arguments rely primarily on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, which held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under [] section 1465.8 and Government Code section 70373." (*Dueñas, supra*, at p. 1164.) The *Dueñas* court also held that "although [] section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164.) The People counter that defendant's argument is forfeited, and in any event, defendant's argument fails on the merits.

We agree that defendant's claim is forfeited. At sentencing, defense counsel asked the trial court to "minimize or waive any fines or fees, where possible." Defendant did

---

**4** We note that to the extent defendant paid any portion of those fees prior to July 1, 2021, defendant is not entitled to reimbursement of those payments, as Assembly Bill 1869 strikes only the "unpaid balance" of those fees. (See *People v. Conley* (2016) 63 Cal.4th 646, 656-658.)

**5** The trial court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)), a $1,840 court operations assessment (§ 1465.8, subd. (a)(1)), a $1,380 court facility fee (Gov. Code, § 70373), a $300 fee under section 290.3, and further imposed but suspended a $10,000 parole revocation restitution fine. (§ 1202.45.)

24

not object to the imposition of fines and fees based on his ability to pay, or otherwise raise the issue of his inability to pay.

"In general, a defendant who fails to object to the imposition of fines, fees, and assessments at sentencing forfeits the right to challenge those fines, fees, and assessments on appeal. [Citations.]" (*People v. Greeley* (2021) 70 Cal.App.5th 609, 624, review den. Jan. 5, 2022, S272033.) Defendant was sentenced in December 2020, nearly two years after the publication of *Dueñas*. There is no reason why defendant could not have requested an ability to pay hearing based on *Dueñas*. By failing to do so, defendant forfeited the issue on appeal. (*People v. Curry* (2021) 62 Cal.App.5th 314, 328, fn. 7, review granted July 14, 2021, S267394; *Greeley, supra*, at p. 624; see also *People v. Nelson* (2011) 51 Cal.4th 198, 227 [defendant forfeited challenge to maximum restitution fine under section 1202.4 by failing to object at sentencing].)

IV

*Section 290.3 Penalty Assessment*

In their responsive brief, the People argue that the trial judge was required to impose $510 in penalty assessments on defendant's $300 sex offender fine. (§ 290.3.) Defendant does not address this argument on reply. We agree with the People.

"Once the section 290.3, subdivision (a) sex offender fine is imposed, the trial court is duty bound to require the accused to pay the additional section 1464, subdivision (a) and Government Code section 76000, subdivision (a) penalty assessments." (*People v. Stewart* (2004) 117 Cal.App.4th 907, 911.) A trial court's failure to impose those penalty assessments is a jurisdictional error that may be raised for the first time on appeal. (*Id.* at pp. 911-912.)

Here, the trial court imposed a $300 fine pursuant to section 290.3. Section 1464, subdivision (a)(1) requires a penalty of 10 dollars for every 10 dollars (or part of 10 dollars) of the $300 fine, which is, here, a total penalty of $300. Government Code section 76000, subdivision (a)(1) requires a penalty of seven dollars for every 10 dollars

25

(or part of 10 dollars) of the $300 fine, for a total penalty here of $210.  Thus, taken together, defendant's total mandatory penalty assessment is $510.  We will modify the judgment to include the additional $510 in penalty assessments.

V

*Senate Bill 567*

In a supplemental brief, defendant contends his sentence should be vacated and remanded in light of Senate Bill 567's amendments to section 1170, subdivision (b).  The People concede that Senate Bill 567 applies retroactively to defendant's case but argue that remanding the case for resentencing is unnecessary because the record reflects beyond a reasonable doubt that a trier of fact would have found true any of the aggravating circumstances cited by the trial court.  We conclude that remand for resentencing is not required because any error was harmless.

Senate Bill 567, which went into effect after defendant's sentencing, provides that the chosen term shall not exceed the middle term unless the facts supporting the aggravating circumstances are:  (1) established by the defendant's stipulation; (2) proven to the trier of fact beyond a reasonable doubt; or (3) based on prior convictions evidenced by a certified record of conviction.  (Stats. 2021, ch. 731, §§ 1.3, 3(c), adding § 1170, subd. (b)(1)-(3), by amendment.)  The parties correctly agree the amendments qualify as ameliorative changes to the sentencing laws and therefore apply to any judgment that, like defendant's, was not final on the new legislation's operative date.  (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307-308; *People v. Frahs* (2020) 9 Cal.5th 618, 624-625.)

The trial court sentenced defendant to the upper term on counts one through three, six through ten, thirteen through nineteen, twenty-one, twenty-two, twenty-nine through thirty-two, and thirty-six, and on the section 12022.3 weapon enhancements for counts one through three, six through ten, thirteen through nineteen, and thirty-six.  In doing so, the trial court explained that it imposed the upper term for both the convictions and

26

enhancements based on the following aggravating factors: (1) the crimes involved great violence or bodily harm; (2) the victims were particularly vulnerable; (3) the manner in which the crimes were carried out indicated planning or sophistication; (4) defendant engaged in violent conduct that indicates a serious danger to society; and (5) defendant committed perjury at trial. (Cal. Rules of Court, rule 4.421(a)(1), (3), (6), (8) & (b)(1).)**6** With respect to defendant's crimes, the trial court also found that defendant's use of a weapon was an aggravating factor. (Rule 4.421(a)(2).) Finally, the trial court relied on section 1170.84, which requires the trial court to consider the fact that defendant tied or bound victims during the sexual assaults to be an aggravating factor. The trial court also noted that defendant's minimal criminal record was the sole mitigating factor.

The trial court then restated many of the aggravating factors and asserted that "any of these aggravating factors and/or any of the other aggravating factors already set forth in the record would, standing alone, be sufficient to justify the upper term for all of these convictions [and all of the weapons enhancements]."

A.      *Sentencing framework*

Pursuant to the Sixth Amendment of the United States Constitution, any fact that exposes a defendant to a greater potential sentence must be found by a jury and established beyond a reasonable doubt. (*People v. Sandoval* (2007) 41 Cal.4th 825, 835, citing *Cunningham v. California* (2007) 549 U.S. 270, 281 [166 L.Ed.2d 856, 868].) Further, following the passage of Senate Bill 567, a trial court imposing the upper term must abide by the statutory requirements set forth in amended section 1170, subdivision (b). That includes, as relevant here, having a trier of fact determine the facts supporting the aggravating circumstances beyond a reasonable doubt. (§ 1170, subd. (b)(2).) Here, except for the counts where the jury found defendant tied or bound his victims (which we will address below), the trial court made its own factual findings to support the numerous

---

**6**      Undesignated rules references are to the California Rules of Court.

aggravating factors on which it relied to impose the upper term.[7] Thus, the trial court's imposition of the upper term on those counts and enhancements implicates both constitutional and statutory concerns.

With respect to constitutional error, because (except in the case of tying or binding) *none* of the aggravating circumstances were properly established by a trier of fact beyond a reasonable doubt, the trial court violated defendant's constitutional right to a jury trial. (See *People v. Black* (2007) 41 Cal.4th 799, 812 [no constitutional error if trier of fact establishes a single aggravating circumstance in accordance with the requirements of *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] and its progeny].) Our Supreme Court has held that the denial of the constitutional right to a jury trial on aggravating circumstances is subject to harmless error review under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]. (*People v. Sandoval, supra*, 41 Cal.4th at p. 838.) *Sandoval* frames the operative question as whether "a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury." (*Id*. at 839.)

However, defendant's argument primarily arises from the new statutory rights created by Senate Bill 567, not defendant's constitutional rights. Where there is an error of state law, we analyze the error under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Epps* (2001) 25 Cal.4th 19, 29.) In this case, applying *Watson* requires us to first consider whether there is a reasonable probability that the facts underlying the improperly determined aggravating circumstances would have been established in a statutorily

---

[7]     Although the trial court also found the fact that defendant was armed with or used a weapon to be an aggravating factor to justify imposition of the upper term on defendant's convictions, and the jury made this finding beyond a reasonable doubt as to numerous convictions, section 1170, subdivision (b) provides that "the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law."

permissible manner, most notably, found true beyond a reasonable doubt if submitted to a jury, or court in a court trial. (*Watson, supra*, at p. 836; § 1170, subd. (b)(2).) As we will explain below, these harmless error standards as applied to both constitutional violations (*Chapman*) and errors of state law (*Watson*) are met in this case as to one aggravating factor relied upon by the trial court: defendant's perjury at trial.

Still, this is not the end of the analysis. The parties dispute whether we can properly find harmless error based on a *single* aggravating circumstance where, as here, the trial court found multiple circumstances in aggravation, as well as a circumstance in mitigation. On this point, two appellate courts have disagreed. (Compare *People v. Flores* (2022) 75 Cal.App.5th 495, 500-501 [applying *Sandoval* to find harmless error under Senate Bill 567 where the reviewing court is convinced beyond a reasonable doubt that " 'the jury would have found true at least one aggravating circumstance' "], with *People v. Lopez* (2022) 78 Cal.App.5th 459, 467, fn. 11 [no prejudice under Senate Bill 567 if a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied].) *Lopez* goes on to hold that if the reasonable doubt standard cannot be met with respect to all aggravating factors, we apply the *Watson* harmless error test to assess whether the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors. (*Lopez, supra*, 78 Cal.App.5th at p. 467, fns. 10, 11.)[8]

---

[8] More recently, Justice Liu noted this split in a concurrence issued in conjunction with our Supreme Court's decision to deny depublication of *Flores*. (*People v. Flores*, dec. to deny depublication, June 15, 2022, S274232 [2022 WL 2159020].) Justice Liu suggested that because of Senate Bill 567's amendments to section 1170, "it may no longer be true that 'the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term.' ([*People v.*] *Black* [(2007)] 41 Cal.4th [799,] 813.) Instead, it appears a defendant is subject to an upper term sentence only if the aggravating circumstances are sufficient to 'justify the imposition' of that term under all of the circumstances, which may include evidence both in aggravation and in

Here, because of the trial court's comments at sentencing, we need not broadly resolve this disagreement. The trial court expressly stated that even if it could rely on only one of the many aggravating factors it listed, it would still impose the upper term on every count and enhancement. We can therefore confidently conclude that it is not reasonably probable that the trial court would have exercised its sentencing discretion differently even if it could permissibly rely on only one aggravating factor. (See *People v. Price* (1991) 1 Cal.4th 324, 492, superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165; *People v. Avalos* (1984) 37 Cal.3d 216, 233 [a reasonable probability of a more favorable result exists where the improper factor was determinative for the sentencing court or where the reviewing court cannot determine whether the improper factor was determinative].) Thus, the only question before us is whether the *Chapman* "reasonable doubt" standard is met as to one aggravating factor relied on by the trial court. If so, then the lesser *Watson* "reasonably probable" standard is also necessarily met, and the error is harmless.

B.    *Perjury*

The trial court found defendant perjured himself on the stand and relied on this finding as an aggravating circumstance for all counts and enhancements. We conclude beyond a reasonable doubt that the jury would also have found defendant committed perjury beyond a reasonable doubt.

Rule 4.421(a)(6) provides that suborning perjury, or otherwise illegally interfering with the judicial process, is an aggravating factor for sentencing purposes. To be guilty of perjury, a person must be found to make a willful statement, under oath, of any material matter which the person knows to be false. (*People v. Howard* (1993) 17 Cal.App.4th 999, 1004 (*Howard*), citing § 118.) Consistent with *Howard*, the trial court

---

mitigation. (§ 1170, subd. (b)(2); *id.*, subd. (b)(4).)" (*People v. Flores, supra*, dec. to deny depublication (conc. statement of Liu, J.) **7.) However, our Supreme Court has not yet taken a position on this issue.

found that during defendant's testimony at trial, defendant "made a willful statement under oath, of material matters which he knew to be false." We must therefore determine whether the jury would have made these same findings beyond a reasonable doubt. The answer here is, unquestionably, yes.

When defendant testified on his own behalf, he flatly denied any involvement with any of the crimes for which he was charged. Specifically, when asked, "Did you have anything to do with any of [the alleged] sexual assaults?" he responded, "Absolutely not." His attorney asked defendant to explain how his genetic material appeared at all of the crime scenes except the Davis 1997 crime scene, and defendant answered, "All I can say to this is: I was never at these locations and I never did what I'm being accused of. . . . I don't know but I was never there and never did these things." Defense counsel then asked, "Did you ever tie up any woman during the course of a sexual assault?" Defendant answered, "No." When asked, "Did you ever put a weapon to any woman's head in an attempt to sexually assault them?" defendant responded, "Never put a weapon to anybody's head, period."

The jury found beyond a reasonable doubt that defendant committed every crime and found true the facts underlying every enhancement for which he was charged. Implicit in these findings is the jury's conclusion that defendant lied when he testified that he did not commit any of the alleged crimes. (See *Howard, supra*, 17 Cal.App.4th at pp. 1004-1005 [by convicting the defendant of sexual assault, the jury "evidently" decided he committed perjury, supporting perjury as an aggravating factor despite trial court's lack of express factual findings]; see also *People v. Cornelius* (2020) 44 Cal.App.5th 54, 58 [jury "implicitly found" the defendant was the actual killer by convicting him of murder and finding he used a firearm to commit the crime].) Thus, applying the reasonable doubt standard, we conclude the jury would have found that defendant lied under oath.

Further, the jury would have found, beyond a reasonable doubt, that defendant's lies were material. Indeed, the prosecution argued that because defendant did not contest that the victims were sexually assaulted by *someone*, the "issue in this case is identification." As defendant testified that he was *not* the man who assaulted the victims, the jury would have found that defendant lied about the central material issue in the case: the identity of the person who committed the alleged crimes. Finally, the jury would have found beyond a reasonable doubt that defendant lied willfully and with the knowledge that he was lying under oath. Defendant testified cogently and competently. There is no evidence indicating defendant gave false testimony " 'due to confusion, mistake or faulty memory.' " (*Howard, supra*, 17 Cal.App.4th at p. 1005.) Nor did defendant testify " 'to matters such as lack of capacity, insanity, duress or self-defense.' " (*Ibid*.) Indeed, defendant's closing argument emphasized defendant's credibility. His counsel asserted to the jury that when defendant testified, he "went up there and did the best he could, with the information he had," and that "[i]n regards to [defendant's] testimony, he did not lie, as the DA told you." Thus, defense counsel argued that defendant's testimony was intentional and credible. Based on this record, the jury would have concluded that, by denying involvement with any of the crimes in this case, defendant knowingly and willfully lied under oath. Based on this, we find, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true that defendant committed perjury.

In making this finding, we also must conclude that the lesser *Watson* standard is met, as it is reasonably probable that the jury would have found that defendant committed perjury beyond a reasonable doubt. As the trial court found defendant's perjury was an aggravating circumstance supporting imposition of the upper term on all applicable counts and enhancements, and as the trial court made clear that it considered any single aggravating circumstance to be sufficient to impose the upper terms, we conclude that

any failure to apply Senate Bill 567 at sentencing was harmless error under both *Chapman* and *Watson*. Remand for resentencing on this ground is therefore not required.

C. *Tying or binding*

We note that we may separately affirm the trial court's imposition of the upper term on counts thirteen through nineteen, twenty-one, twenty-two, and twenty-nine because for those counts, there was no statutory or constitutional error. On counts thirteen through nineteen, twenty-one, twenty-two, and twenty-nine, the jury found true, beyond a reasonable doubt, the special allegation that defendant bound or tied the victims. (§ 667.61, former subd. (e)(6).) Section 1170.84 provides that "[u]pon conviction of any serious felony, listed in subdivision (c) of Section 1192.7, it shall be considered a circumstance in aggravation of the crime in imposing a term under subdivision (b) of Section 1170 if, during the course of the serious felony, the person engaged in the tying, binding, or confining of any victim."

Thus, by finding the special allegation true, the jury made a finding, beyond a reasonable doubt, to support one of the aggravating circumstances relied upon by the trial court to impose the upper term. Defendant's constitutional right to a jury trial, and the requirements of Senate Bill 567, are therefore met as to counts thirteen through nineteen, twenty-one, twenty-two, and twenty-nine. And, as discussed, a single aggravating factor is sufficient in this case to affirm the trial court's imposition of the upper term. Thus, for this additional reason, remand for resentencing on counts thirteen through nineteen, twenty-one, twenty-two, and twenty-nine is not required under Senate Bill 567.

## DISPOSITION

We modify the judgment to reduce count five to felony false imprisonment (§ 236) and impose the lower term of 16 months on that count to run concurrently. We further modify the judgment to (1) include $510 in section 290.3 penalty assessments under section 1464, subdivision (a), and Government Code section 76000, subdivision (a); and to (2) vacate defendant's $453.62 main jail booking fee and $90.65 main jail

33

classification fee.  The judgment is in all other respects affirmed.  The trial court is directed to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.


      KRAUSE      , J.


We concur:


      ROBIE      , Acting P. J.


      DUARTE      , J.